**CREDITO Y AHORRO PONCENO v. GORBIA (substituted for GATELL).**

Circuit Court of Appeals, First Circuit.
April 18, 1928.

No. 2089.

**I. Bankruptcy ⟵161(1)—Unrecorded transfer of tobacco growers' notes from bankrupt firm to bank, over four months before bankruptcy, to secure loan, held not voidable preference (Bankr. Act, § 60a; 11 USCA § 96(a).**

Transfer of tobacco growers' notes to bank from firm furnishing such tobacco growers' money and supplies, to secure firm's loan, need not be recorded under Porto Rican law, so that their unrecorded transfer is not voidable preference, under Bankruptcy Act, § 60a (11 USCA § 96(a), if it took place more than four months before filing of firm's petition in bankruptcy.

**2. Bankruptcy ⟵167—Transfers of partners' individual property held not voidable as preference on bankruptcy of partnership (Bankr. Act. §§ 60, 67 [11 USCA §§ 96, 107]).**

Transfer of properties of individual partners to bank to secure loans to partnership *held* not voidable preference, within Bankruptcy Act, § 60 or section 67 (11 USCA §§ 96, 107), on bankruptcy of partnership, where petition in bankruptcy did not seek adjudication of partners as individuals, and they were not adjudicated bankrupt.

**3. Assignments ⟵78—Sale or assignment of credit includes all "accessory rights" (Civ. Code Porto Rico, § 1431).**

A sale or assignment of a credit includes that of all the "accessory rights," such as the security, mortgage, pledge, or privilege, both under common law and Civ. Code Porto Rico, § 1431 (Rev. Stats. & Codes of Porto Rico 1911, p. 760).

**4. Bankruptcy ⟵188(1)—Where partnership transferred tobacco growers' notes, secured by crop lien, to bank more than four months before bankruptcy, trustee had no claim to tobacco subsequently delivered (Civ. Code Porto Rico, §§ 1822, 1823, subd. 6, and § 1827).**

Where partnership, acquiring tobacco growers' notes for cash and supplies to be used in planting, acquired as incident of notes lien on crops, and subsequently transferred notes to bank more than four months before bankruptcy, bank, from time of transfer, owned partnership's interest in tobacco, so that it was entitled to proceeds of tobacco subsequently delivered, as against partnership's trustee in bankruptcy, under Civ. Code Porto Rico, §§ 1822, 1823, subd. 6, and section 1827.

**5. Bankruptcy ⟵188(10)—It was not fraudulent for bankrupt's creditor to agree to release portion of security to aid bankrupt to meet composition agreement with general creditors.**

It was not fraudulent for bank, which was creditor of bankrupt partnership, to offer or agree to release portion of its security in certain tobacco to aid bankrupt firm to meet its composition agreement with general creditors.

25 F.(2d)—52

**6. Bankruptcy ⟵188(10)—Bankrupt cannot defeat creditor bank's title to tobacco in bankrupt's possession, by wrongfully intermingling its own tobacco with that belonging to bank.**

Where bankrupt firm has possession of tobacco belonging to creditor bank as security for notes assigned to such bank, it cannot defeat bank's title, nor confer such title on itself or its trustee in bankruptcy, by wrongfully intermingling its own tobacco with that belonging to bank.

Anderson, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Porto Rico; Ira K. Wells, Judge.

Suit by Emilio Gorbia, substituted for Francisco I. Gatell, trustee in bankruptcy of Barrionuevo, Zeno & Co., against the Credito y Ahorro Ponceno. Judgment for plaintiff, defendant appeals. Reversed and remanded, with directions.

Hollis R. Bailey, of Boston, Mass. (Jose A. Poventud and Albert S. Poventud, both of Ponce, Porto Rico, on the brief), for appellant.

Harry F. Besosa, of San Juan, Porto Rico, for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. The plaintiff appellee is the trustee in bankruptcy of the firm of Barrionuevo, Zeno & Co., which filed a voluntary petition in bankruptcy on August 30, 1921, and was adjudicated a bankrupt the following day. This firm consisted of three members, the active partners being Mr. Barrionuevo and Mr. Zeno. They were merchants and, as a part of the firm's business, furnished money and supplies to colonos (tobacco growers) to aid them in planting, cultivating, and harvesting their crops, receiving in return for the advances made notes in each of which it was agreed that the amount advanced should "be preferential as to legal effects, because it is the expressed condition that the amount covered by this obligation will be used by me only and expressly in the expenses of refaction for my tobacco crops."

The defendant appellant is a bank, which loaned money to the firm. In September, 1920, the firm had overdrawn its account at the bank by about $17,000, and gave the bank its note for $24,000 to cover the overdraft and additional credit then advanced. On April 16, 1921, the firm's indebtedness to the bank was $29,516.83. On that date the two active partners executed an instrument, in which Mr. Barrionuevo and Mr. Zeno, each acting in his own right and with the consent

of his wife, mortgaged to the bank certain parcels of real estate owned by each individually, and in which Mr. Barrionuevo assigned to the bank certain mortgages or mortgage credits owned by him on real estate, to secure the indebtedness of the firm and a further advance of $2,000, then agreed to be made and which was made on April 19, 1921. By this instrument and by indorsement and delivery, these partners, acting in the right of the firm, also transferred to the bank 19 of the colonos' notes amounting to $22,323, the notes having been given the firm by the colonos for advances made by the firm to enable them to plant, cultivate, and harvest their tobacco crops. In this instrument of April 16, 1921, these active partners in behalf of the firm stipulated "that said notes represent amounts advanced to the debtors by the firm of Barrionuevo, Zeno & Co. for crop loans and they are guaranteed by contracts of agricultural loans." This instrument was filed for record July 5, 1921, and was recorded July 15, 1921. Before this instrument was made and to induce the bank to enter into it, the active partners agreed in behalf of the firm to notify the bank when the tobacco was received from the colonos who signed the notes, and on July 2, 1921, they wrote the bank stating the names of the signers of the notes, and opposite each name gave the number of quintals of tobacco received from each up to that time by the firm; also stating that the weights given were gross weights and without discount for shrinkage. And on August 5, 1921, the firm again wrote the bank a letter of the same tenor, stating the names of the signers of the notes, the amount of tobacco received from each, and that the total amount of tobacco then received on the notes transferred to the bank was 918 quintals and 39 pounds.

On August 24, 1921, the active partners, in behalf of the firm, made another instrument in favor of the bank, in which, after setting out the stipulations contained in the instrument of April 16, 1921, and restating the names and amounts of the colonos' notes that were pledged to the bank in that instrument, they acknowledged that, since the transfer of the notes to the bank, the firm "had received in payment of the amounts advanced and secured by the promissory notes, leaf tobacco given *as security* for the promissory notes and the agricultural loan contracts mentioned," amounting to "nine hundred and forty-eight quintals and thirty-nine pounds (948.39) of leaf tobacco of the present crop and of the foot, middle, and top grades, in good condition." They also therein stated "that, since the promissory notes given to the

Credito y Ahorro Ponceno have been paid with this tobacco, it is but proper that they be substituted by the tobacco, in so far as they have been paid, in order that they might reinforce the security of payment given in April of this year," and pledged to the bank the 948 quintals and 39 pounds of tobacco, stating "that this tobacco is delivered to-day to the depositary, * * * Mr. Aufiloquio Gandara, who appears in this act, by putting Mr. Gandara in possession of the tobacco and under his exclusive custody." Later in the instrument Gandara acknowledges having received the tobacco "in the amount, class, and crop indicated," and is warned by the notary that, having acknowledged the receipt of the tobacco and accepted the office, "he is bound to keep and take good care of the tobacco and have it at the exclusive disposal of the bank."

The evidence also shows that at that time the 948 quintals and 39 pounds of tobacco were measured, tagged with the name of the bank, and set apart by itself in the firm's warehouse; that the depositary, Gandara, was given the key to the warehouse, took possession of the tobacco, and retained the control and possession of it until February, 1922, when the bank and the firm, by mutual arrangement, sold this tobacco and other tobacco of the firm then in the warehouse for $23,063.18; that the total amount of tobacco then sold was 1,396 quintals and 18 pounds (1,396.18), of which the tobacco in question, as measured at the time of the sale, amounted to 903 quintals and 46 pounds (903.46); and that the price received for this was $18,972.66. The entire proceeds of the sale were delivered to the bank by the purchaser. A tender of $4,090.52, representing the difference between the price paid for all of the tobacco and the price paid for that claimed by the bank, the trustee declined to accept. The $18,972.66 received for the tobacco in question did not equal the face of the 19 colonos' notes to within $3,350, and the evidence fairly shows that the tobacco crop of a colono in no case exceeded the face of his note, and in most cases was much less.

The District Court entered a decree setting aside the instruments of April 16, 1921, and August 24, 1921, as preferences; ordered all of the property mortgaged to the bank, all the mortgages or mortgage credits assigned to the bank, and all the colonos' notes transferred to it turned over to the trustee; ordered the $18,972.66, the proceeds of the tobacco in question, with interest, paid to the trustee; and that the records in the public registries of the instruments of April 16 and August 24, 1921, be canceled and the

same recorded in the name of the trustee. It is from this decree that the present appeal is taken.

The principal questions raised by the assignments of error are: (1) Whether the transfers of the respective parcels of land and the assignments of the mortgages or mortgage credits, properties of the individual partners, and the indorsement and the transfer of the notes (firm assets) constituted voidable preferences within the meaning of section 60 or 67 of the Bankruptcy Act (11 USCA §§ 96, 107); and (2) whether the tobacco was security for the $22,323 of colonos' notes, the right to which passed to the bank on April 16, 1921, when the notes were endorsed and transferred to it, or did not take effect as security for the notes until the execution of the instrument of August 24, 1921, which was within four months of the filing of the petition in bankruptcy, and was a voidable preference within the provisions of the Bankruptcy Act (11 USCA).

The District Court, in setting aside the instrument of April 16, 1921, apparently proceeded on the theory that the petition in bankruptcy seeking the adjudication of the firm was in effect a petition against the partners as individuals, and that an adjudication of the firm was also an adjudication of the individual partners, and, being of the opinion that the instrument was one which by local law was required to be recorded, it was a voidable preference under section 60a (11 USCA § 96[a]), as it was not recorded until within four months of the filing of the petition in bankruptcy.

[1] So far as the instrument of April 16, 1921, purported to transfer the colonos' notes (assets of the partnership), the District Court was plainly in error, for there is no provision of Porto Rican law requiring that their transfer be evidenced by an instrument subject to registration. As no record of their transfer was necessary, their transfer was not a voidable preference under section 60a, for it took place more than four months prior to the filing of the petition in bankruptcy.

[2] Neither do we think that the instrument of April 16, 1921, so far as it was a mortgage of individual properties of the partners and an assignment of mortgages or mortgage credits, the individual property of one of the partners, was a preference voidable within the meaning of section 60 or 67. The petition in bankruptcy filed August 30, 1921, did not seek the adjudication of the partners as individuals and they have never been adjudicated bankrupts. Transfers of the individual property of a partner or liens imposed thereon by legal proceedings are not voidable as preferences or nullified as liens by the bankruptcy of the partnership.

In considering the question here presented, it is unnecessary to determine whether the instrument of April 16, 1921 (by which the individual properties of the partners were mortgaged and the mortgage credits of one of them transferred) was required by the law of Porto Rico to be recorded to render it valid as between the parties, for it was filed for record on July 5 and recorded July 15, 1921, and was not avoided by the filing of the petition in bankruptcy against the firm, even though its record took place within four months of the filing of that petition. The legal effect of the filing of the petition against the firm was to avoid preferential transfers of firm property made within four months, and not transfers of the individual properties of the partners. In order to have avoided such transfers as preferential, petitions in bankruptcy should have been filed by or against each of the active partners, within four months of the time the transfers were made, if recording was not required, or within four months of the recording of the transfers, if recording was required. No petitions in bankruptcy by or against these partners as individuals have ever been filed.

This subject has recently been under consideration by the Supreme Court in the case of Liberty National Bank of Roanoke v. Bear, Trustee (U. S. Sup. Va.) 48 S. Ct. 252, 72 L. Ed. ——, decided February 20, 1928. There an involuntary petition was filed against a partnership in August, 1920, upon which it was adjudicated a bankrupt. In the preceding July the bank had brought a suit against the firm and the individuals composing it, and during that month obtained judgment liens upon the real estate of the individuals. In a suit brought by the bank against the trustee in bankruptcy of the firm and of the individual partners, to assert its liens upon the individual properties of the partners, the trustee contended that these liens were voidable preferences under section 67f (11 USCA § 107[f]), as they were obtained within four months of the filing of the petition against the firm. It was held, however, that the liens were not avoided by the filing of the petition against the firm; that the firm as an entity could be adjudicated a bankrupt independently of the members composing it; that, to have avoided these liens, petitions should have been seasonably filed against the individual members upon whose properties the liens were imposed; and that, as no such pe-

tition was filed until eight or nine months after the liens attached, the liens were not avoided.

[3, 4] The remaining question relates to the 948 quintals and 39 pounds (948.39) of tobacco, which at the time of the sale · was found to contain only 903 quintals and 46 pounds (903.46), and the $18,972.66 derived from its sale.

The contention of the defendant bank is that this tobacco was security for the $22,323 of colonos' notes, which on April 16, 1921, the firm of Barrionuevo, Zeno & Co. indorsed and transferred to the bank as security for its indebtedness to the bank; that this tobacco was subject to a lien, equitable or statutory, for the benefit of the owner of the colonos' notes; and that, on the transfer of these notes to the bank, this right in the tobacco passed to it by operation of law, as an incident of the notes.

It must be conceded that, if the colonos' notes were secured by the 948 quintals and 39 pounds (948.39) of tobacco by way of a lien thereon, the right to the possession of the tobacco passed to the bank upon the transfer to it of the notes on April 16, 1921; for under the Code of Porto Rico "The sale or assignment of a credit includes that of all the accessory rights, such as the security, mortgage, pledge, or privilege." Civil Code of Porto Rico, § 1431; Rev. Stats. and Codes of Porto Rico 1911, p. 760; 10 Manresa, pp. 350, 351. This is also the principle of the common law. Hilton v. Woodman's Estate, 124 Mich. 326, 82 N. W. 1056; McDonald v. Kelly, 14 R. I. 335; Lyon v. Summers, 7 Conn. 399; Batchelder v. Jenness, 59 Vt. 104, 7 A. 279; Hurt v. Wilson, 38 Cal. 263; Perot v. Levasseur, 21 La. Ann. 529.

It must also be conceded that, if the firm acquired a right in the nature of a lien in the respective colonos' tobacco crops as security for their notes, such right not only passed to the bank at the time when the firm indorsed and transferred the notes to the bank, but that thereupon the firm ceased to have any right or title to the tobacco of which it could avail itself or which would pass to its trustee in bankruptcy, and that the possession which the firm subsequently obtained from the respective colonos was acquired, not as owner of the tobacco, but as agent or bailee for the bank. The evidence shows that the firm understood and represented that the tobacco was security for the notes (see notes and instrument of April 16, 1921), and after receiving the tobacco recognized that it so held it, for under the dates of July 2 and August 5, 1921, and in compliance with its previous agreement so to do, it notified the bank of the amounts of tobacco which it had received at its warehouse from each one of the colonos, whose notes had been transferred to the bank, stating their names and the amount of tobacco received from each. The evidence also shows that on August 24, 1921, the tobacco securing these notes was set apart by itself, tagged with the name of the bank, and turned over to the possession and control of a depositary for the bank, who continued in possession and control of it until some time in February, 1922, when by joint arrangement between the bank and the firm the tobacco in question and other tobacco of the firm was sold to a single purchaser for $23,063.18, of which sum the tobacco in question brought $18,972.66.

The real question, then, is whether the firm, when it furnished the cash and supplies to the 19 colonos to be used in planting, raising, and curing their tobacco crops, and received in return their 19 individual notes, acquired as an incident of the notes a security in the nature of a lien on the respective crops for the raising and curing of which the cash and supplies were advanced?

Most of the colonos' notes were given in October, November, and December, 1920, and became due May 30 and June 30, 1921. In each note it was expressly declared that the amount advanced should "be preferential as to legal effects [that is, that the crop to be raised should be security for the amount advanced], because it is the expressed condition that the amount covered by this obligation will be used by me only and expressly in the expenses of refaction for my tobacco crop." The colonos, in compliance with the agreement in the notes, in May and June, and prior to August 5, 1921, turned over to the firm their crops, to secure and pay their respective notes, and the firm in recognition of its agreement with the bank notified the bank of the receipt of the tobacco. The firm had no title to the tobacco when it received it, for it did not then own the notes for which the tobacco was agreed to be security, and to perfect which it was delivered to the firm. It received the tobacco as agent for the bank, and because of this notified the bank of its receipt. As the firm had no title to the tobacco when it filed its petition in bankruptcy, or at any time within four months prior thereto, the trustee in bankruptcy acquired none, and there is no basis upon which he can maintain this suit to recover the $18,972.-66, the proceeds of the tobacco.

Then again the Civil Code (title 17, c. 2) provides:

"Sec. 1822. Credits shall be classified for their graduation and payment in the order and manner specified in this chapter.

"Sec. 1823. With regard to specified personal property of the debtor, the following are preferred:

\*    \*    \*    \*    \*    \*

"6. Credits for seeds and expenses of cultivation and harvesting, advanced to the debtor, with regard to the fruits of the crops to which they were applied."

"Sec. 1827. Credits which enjoy preference with regard to certain personal property *exclude all the others* to the extent of the value of the personal property to which the preference refers.

"When two or more creditors claim preference with regard to certain personal property, the following rules shall be observed as to priority of payment:

\*    \*    \*    \*    \*    \*

"3. Credits for advances for seeds, expenses of cultivation, and harvesting, shall be preferred over those for rents and leases, with regard to the fruits of the crop for which they were incurred."

There can be no doubt but that section 1823, subd. 6, of the Civil Code recognizes the crop, in the production of which a credit is to be used, as a security for the credit advanced. This was the view taken by this court of In re Vidal, 233 F. 733, 736, 737.

[5, 6] It was not fraudulent, as seems to be suggested, for the bank to offer or agree to release a portion of its security in the tobacco to aid the bankrupt firm to meet its composition agreement with its general creditors. And if the firm caused tobacco, which it owned or in which it had an interest, to be intermingled with the tobacco in its possession belonging to the bank (which we do not find to be the fact), such wrongful intermingling would not defeat the bank's title to its tobacco, or confer title to it upon the firm or its trustee in bankruptcy.

The decree of the District Court is reversed, and the case is remanded to that court with directions to dismiss the suit, with costs to the appellant.

ANDERSON, Circuit Judge (dissenting). In this sadly mismanaged bankruptcy case, I can see no escape from the conclusions of my associates as to the validity of the transfer of the property of the unadjudicated individual partners. And if and in so far as the instrument of April 16, 1921, transferred notes (probably already discounted with the bank) I think the transfer good without record.

But I am unable to agree that these notes were secured notes, and that the sum of $18,972.66, as alleged proceeds from the sale of applicable security, can be held by the bank.

The majority rest their conclusion that the 19 notes were secured on two grounds. The first is that the recital in the notes that the amount advanced should "be preferential as to legal effects," "created a right in the tobacco in the nature of a lien for the benefit of the owner of the notes." What "a right *in the nature of* a lien" is I do not know. It is or it is not—a lien. But this amounts to saying that the notes were equivalent in law to mortgage notes, though no mortgage was executed or recorded under the act "for contracts of advances for agricultural purposes," etc., of March 10, 1910, now R. S. §§ 52–72. This act seems to cover, at least in part, the same field as the Act of March 10, 1904, now R. S. §§ 36–50, for agricultural loans. Both acts require formal instruments duly recorded.

Agricultural loans are under a sort of supervision of the municipal court (R. S. §§ 37–42), which issues a "certificate enabling the agriculturist to procure the loan." On maturity, the holder of this certificate must within 20 days apply to the municipal court for sale at public auction duly notified; failing action for 20 days, the creditor forfeits his preference.

Under the act of 1910, supra, there is an express requirement that the creditor give the debtor an extension (section 55), and in case of suit the debtor may petition for such extension (section 60) and the order therefor is to be duly recorded in the registries of contracts for agricultural purposes (section 63).

Under the ruling now made, compliance with these provisions, intended for the protection of the borrower, is held entirely unnecessary; the lender may get full security by requiring his borrower to sign notes containing this rhetorical recital—"preferential as to legal effects." The statutory provisions intended to limit the greed and power of lenders and to invalidate secret liens are thus held nugatory. I cannot accept that doctrine.

The second stated basis for the ruling that the notes are secured is Civ. Code, tit. 17, c. 2, R. S. §§ 1822, 1823, 1827. This title is a local insolvency or bankruptcy law, and the provisions cited and relied upon have to do with priorities only if and when an insolvent debtor is proceeding under that law. It has not the slightest relation to rights accruing, as in this case, under the National Bankruptcy Act. The system of distribution

provided in it is, as pointed out by Judge Dodge for this court in the Vidal Case, 233 F. 733, 737, "plainly inconsistent as a whole with that established by the National Bankruptcy Act." Probably this insolvency law is suspended, as state insolvency acts are suspended, when the nation exercises its paramount power over bankruptcy. Gilbert's Collier, Bankruptcy, p. 8, and cases cited. At any rate it cannot create lien rights under the Bankruptcy Act.

That this act is in effect a local bankruptcy law appears plainly enough from such sections as 1813 and 1814, reading:

"Sec. 1813. A debtor may judicially ask from his creditors a reduction in the amount and an extension of time in the payment of his debts, or either of the two things, but the exercise of this right shall not produce judicial effects, except in the cases and in the manner prescribed in the law of civil procedure.

"Sec. 1814. A debtor, whose liabilities are greater than his assets, and who may have failed to meet his current obligations, must file a petition in bankruptcy (concurso) in a competent court, as soon as he is aware of being in such condition."

Of course "competent court" means a Porto Rican court. Porto Rico cannot dictate as to when our Bankruptcy Act shall be invoked. And if we turn to the Code of Commerce (Book 4, §§ 8429–8481) we find elaborate provisions for "Suspension of Payments and Bankruptcy in General."

Among other things this Code divides bankruptcy into (1) "accidental insolvency;" (2) "culpable insolvency;" and (3) "fraudulent insolvency"—with elaborate definitions of the three kinds. The provisions for discharge are in section 8480:

"(8480) Art. 921. The bankrupts not included in the foregoing article may obtain their discharge by proving that they have fully complied with the approved adjustment they may have made with their creditors.

"Should there have been no agreement, they shall be obliged to prove that all the obligations acknowledged in the bankruptcy proceedings were liquidated with the assets of the same, or through subsequent payments."

—and sections 1818, 1819, and 1820:

"(4924) Sec. 1818. Settlements, which the debtor and his creditors may judicially agree to, with the formalities of law with regard to the reduction of the amount and extension of time, or in bankruptcy, shall be binding on all the concurrent parties and on those who, having been cited and notified in due form, should not have protested in time. The creditors who, having the right to abstain, should have duly made use of such right, are excepted. The creditors included in sections 1823, 1824 and 1825 have the right to abstain.

"(4925) Sec. 1819. If the settlement for reduction of amount and extension of time is agreed to with creditors of the same class, the legal decision of the majority shall be binding on all, without prejudice to the respective preference of the creditors.

"(4926) Sec. 1820. If the debtor should comply with the settlement, his obligations shall be extinguished in the terms stipulated in the same; but, should he fail to comply with the whole or a part of said settlement, the rights of the creditors shall revive for the sums of their original credits which they may not have received, and any of them may demand a declaration in or continuance of bankruptcy."

The parts of this insolvency law cited by my associates have no relation to our present problem. Chapter 2 of title 17 is entitled "Classification of Credits," and, with subdivisions, creates 26 classes, several of which refer to existing liens, as by pledge "mortgage and agricultural credits," "recorded in the registry." Section 1825 (f) reads:

"(4931) Sec. 1825 (f). For income for support during proceedings in bankruptcy, unless they are based on mere beneficence."

This shows clearly, as do also other sections, that the whole title has merely to do with distribution under this local bankruptcy system.

Section 1823, 6, quoted in the majority opinion does not purport to create a lien; it is merely a priority provision in distribution under this local bankruptcy system. To make it avail, the bank must have proved its claim and applied for a priority order section 64b(5) of our act (11 USCA § 104[b] [5]). The bank proved no claim; it took this money under its claim of a pledge on August 24.

It is an utter misconstruction of Judge Dodge's opinion in the Vidal Case, supra, to say that these provisions were regarded as creating a lien. In that case the creditor had proved his notes and sought an order under section 64b(5) for priority under local law, relying on R. S. § 1825 (4), as the notes had been "unauthenticated and acknowledged" in a public notarial instrument. It was conceded that Porto Rican priorities have the same standing under the Bankruptcy Act as have state priorities. But the decision was against this plausible claim. Judge Dodge says (233

F. 737) that "the system of distribution which title 17 purports to establish as above is plainly inconsistent as a whole with that established by the National Bankruptcy Act." And (page 738) he refers to title 17 as being "suspended in operation" by the National Bankruptcy Act. He observes (page 738) that "several sections of title 17 * * * are directly opposed to provisions of the Bankruptcy Act, and could have no force whatever in the face of that act, in any event. * * * But since all the sections of title 17 appear to form together a consistent whole, and the provisions of each to depend upon those contained in all the others, it is doubtful how far the provisions of any one section can remain effective, detached from the others, for any purpose."

So far as this case has any bearing at all on our problem, it is strongly against the view of the majority.

In Bunch v. Maloney, 233 F. 967 (C. C. A. 8th) Hook, J., points out, pages 969, 970, that Congress has repeatedly sought to amend the act so as to prevent secret liens from cutting down the rights of general creditors. In that case it was held (affirming Trieber, D. J., below) that a chattel mortgage given more than four months before bankruptcy, but recorded within four months, was a voidable preference under section 60b (11 USCA § 96 [b]), though under Arkansas law an unrecorded mortgage was good between the parties, etc. He cites Carey v. Donohue, 240 U. S. 430, 36 S. Ct. 386, 60 L. Ed. 726, and distinguishes it. Cf. Gilbert's Collier, p. 691a, and cases cited, on the effect of amendment of 1910 giving to the trustee the title of lien creditor. See, also, Fuller v. Atlanta Nat. Bank, 254 F. 278 (C. C. A. 5th); Bank v. Bell, 275 F. 835 (C. C. A. 5th).

I do not overlook Martin v. Bank, 245 U. S. 513, 38 S. Ct. 176, 62 L. Ed. 441, and Bailey v. Baker Ice Mach. Co., 239 U. S. 268, 36 S. Ct. 50, 60 L. Ed. 275; but I do not think the facts in this case bring it within the doctrine of those cases.

Nothing could be more inconsistent with the dominant purpose of the Bankruptcy Act to provide equality among creditors than this loose doctrine of transmuting any sort of recital of preferential treatment into a lien, the equivalent of duly recorded mortgages. Compare Mass. Tr. Co. v. MacPherson, where I dissented (C. C. A.) 1 F.(2d) 769, and Bunch v. Maloney, supra. The wholesome provisions of the applicable agricultural loan act were intentionally disregarded by these parties. This decision offers rewards for such methods of quasi fraud on the local law as well as on the Bankruptcy Act.

The conduct of the bank shows that it and its counsel recognized that the notes were not legally secured. In the instrument of April 16, the bank had these notes described as "guaranteed by contracts of agricultural loans"; it abandoned this theory in the instrument of August 24, entitled "Reinforcement of Securities Given on April 16, 1921," and containing this explicit statement:

"Second. That said tobacco is the exclusive property of the partnership that pledge it, not existing on same any incumbrance or right which might affect in any form or manner the right of absolute ownership of the debtor partnership."

Here is an absolute negative of the theory now adopted by this court. The instrument provides for enforcement as follows:

"Eighth. In case of execution of this pledge the creditor bank is authorized to follow the proceeding of public auction before a notary, set forth in the Civil Code in force, and this proceeding may take place at Cayey or Ponce, at the option of the creditor bank, and in the same conditions as to place, may be followed the proceeding which the bank may elect for the execution or judicial claim, the debtor firm represented by the parties appearing, expressly submit themselves to courts of the judicial district of Ponce or of Guayama, as the bank may elect; it being agreed as notary or attorney's fees in the execution or judicial claim, the sum of three hundred dollars, which will be paid by these debtors and may be collected from the pledge.

"Ninth. All the expenses of the record of this pledge, for the constitution or cancellation in due time, or of prorogations, or extensions, those of the pledge itself, and any others which may arise by virtue of this contract, as those of policies, and any others, will be for account of these debtors, which may be paid by the bank and charged to the pledge.

"Mr. Anfiloquio Gandara accepts this deed in his capacity as depositary for which he has been duly appointed, which he will fulfill gratis, and he confesses to have received the mortgaged tobacco, in the amount, quality and harvest as aforesaid.

"Mr. Miguel Melendez Munoz, in the capacity in which he appears in this act, accepts this deed.

"Warnings.

"I, the notary, caution Messrs. Barrionuevo and Zeno for themselves and as repre-

sentatives of the partnership, Barrionuevo Zeno & Co., that by the mortgage or pledge they have just made they release themselves of the possession of said tobacco and they will not be able to dispose of same without the written consent of the bank. And to the depositary, Mr. Gandara, I caution him that by the confession of having received the tobacco and accepting the appointment of depositary in this pledge, he is obliged to take care and keep the tobacco in good condition at the exclusive disposition of the bank (creditors bank) he being responsible for same to the bank."

Here is another unmistakable recognition of the transaction as a present pledge, only a week before bankruptcy. It was nothing else. The notes were not agricultural loans, crop notes, or mortgage notes. The bank had prior to August 24 no lien whatever.

But, even if wrong in my view that the deed and alleged seizure of August 24 were not acts perfecting lien rights already existing, the record shows clearly that the tobacco then seized was a hotchpot derived in part from colonos whose notes (of the same tenor as those of the appellant) had gone to the National City Bank, a creditor for over $10,-000, and in part tobacco raised by the bankrupts themselves. If the notes were secured notes, the appellant is now given security belonging in part to the National City Bank. Intermingling, even if wrongful, as stated in the majority opinion, would not give the bank title to tobacco raised by colonos whose notes went to the National City Bank. The appellant can hold this money only by proving (as it has utterly failed to do) that the money is the proceeds of identified tobacco, subject to a valid lien, and duly enforced before bankruptcy. The bank had no lien until August 24; the tobacco claimed was not identified; the alleged lien was not legally enforced. Three fatal defects are enough.

Another insuperable difficulty is that the court below found, on evidence plainly warranting the conclusion, "that the said tobacco claimed to have been pledged never left the actual possession of the bankrupt until it was sold and the proceeds delivered to the defendant bank."

One reason for leaving the bankrupts in possession was that negotiations for a settlement with creditors were then pending. In fact, an offer of composition was later approved, but it failed because the tobacco, when sold, produced much less than was expected, and because the bank had forced from the bankrupts a secret fraudulent agreement for full payment—not, as stated in the ma-

jority opinion, a release of a portion to help out the composition. On the sale in February, 1923, of the whole mass of tobacco without complying with section 57h of the Bankruptcy Act (11 USCA § 93[h]), the bank took and kept the entire proceeds until March, 1926, when, under stipulation and order of the court below, it turned over $4,-090.52.

Of some significance is the fact that counsel for the bank, familiar with the local law, pleads the pledge of August 24 as "merely a substitution of one security by another that was of less value." He does not allege the notes to be agricultural loans or secured under the statutes cited by my associates.

The bank's title to the sum of $18,972.66 is, I think, plainly voidable as a preference.