### ROQUE GONZALEZ & CIA., v. TORRES.
### No. 2528.

Circuit Court of Appeals, First Circuit.
June 29, 1931.

WILSON, Circuit Judge, dissenting.

Henri Brown, of San Juan, Porto Rico, for appellant.

Benicio F. Sanchez, of San Juan, Porto Rico (Campos & Romero, of San Juan, Porto Rico, on the brief), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a decree of the federal District Court of Porto Rico in a proceeding in equity brought by the appellee, as trustee in bankruptcy of one Juan Botet, against the appellants, to have set aside an agricultural loan contract alleged to have been entered into with intent to hinder, delay, and defraud creditors of Juan Botet and to recover of the appellants an alleged preference of $2,351.42, Botet having been adjudged a bankrupt August 12, 1929, on his voluntary petition filed that day.

Botet had three farms in Cidra, Porto Rico, on which he raised tobacco. He also had a store there, where he dealt in merchandise. Prior to January 2, 1929, he purchased merchandise from Gonzalez & Co., defendants-appellants, for which, on January 2, 1929, he owed a balance of $1,696.47, after deducting certain payments amounting to $1,100. On January 2, 1929, he was also owing the firm of Lopez & Co. $2,683.29 for merchandise which he had theretofore purchased. Neither Gonzalez & Co. nor Lopez & Co. had any security for these advancements. They were in fact largely used by Botet in preparing his tobacco crop, although there was no agreement or understanding, at the time they were made, that they would be so used or that Gonzalez & Co. and Lopez & Co. should have a lien on the crop therefor.

In September, 1928, a hurricane swept over Porto Rico, injuring Botet's tobacco crop and taking away his barns, requiring him to build new ones to house his crop.

Finding it necessary that he should have further advances or loans to restore his barns and complete the making and storing of his tobacco crop, he applied to some of his creditors for aid. They declined to extend him further credit. Thereafter, on December 21, 1928, he applied to Gonzalez & Co. and Lopez & Co., requesting advancements and offering to secure them by a refaccion contract on the tobacco crop being raised on his three farms which he then had. These firms agreed to make advancements for use in making, harvesting, and storing his 1929 crop, and a formal contract was drawn up and executed and recorded in compliance with the laws of Porto Rico. In it it was stated that Botet had been advanced $6,000 toward the making of this crop. The fact was that, at that time, he had been advanced by these parties $4,831.64, after deducting payments of $1,100 which had been made to Gonzalez & Co. on their advancements.

It was also provided in the contract that there should be advanced to Botet a further sum of $2,000 to aid him in making and harvesting his tobacco crop. Under this provision of the contract Lopez & Co. turned over to Botet two lots of merchandise of the value of $1,003.54, and Gonzalez & Co., under this branch of the contract, made advances in goods of the value of $1,385.98; and $602.48 for fertilizer—a total of $1,998.46.

While the formal contract ran to Gonzalez & Co. alone, the evidence shows and it was admitted that it was understood and agreed between the parties that it was entered into for the benefit of Lopez & Co. as well.

July 29, 1929, and within four months before the filing of the petition in bankruptcy, Botet turned over to Gonzalez & Co. the proceeds derived from the sale of his tobacco crop, amounting to $2,351.42. Of this sum Gonzalez & Co. turned over to Lopez & Co. $708.16, leaving in their hands a balance of $1,643.26.

In this action the plaintiff, trustee, is seeking to recover of Gonzalez & Co. the entire $2,351.42 received as above stated, and

it is this sum which the court below held the plaintiff was entitled to recover on the ground that the contract of January 2, 1929, was fraudulent and the payment a preference.

It is unnecessary to consider whether the statement in the contract of January 2, 1929—that there had been advanced to Botet the sum of $6,000 to aid him in planting, harvesting, and storing his crop—was true or false and intended to hinder and delay his creditors, for the branch of the contract wherein it was agreed to advance Botet a further sum of $2,000 is entirely separable from that relating to the prior advancements of $6,000. The evidence conclusively shows that Lopez & Co., under the agreement to advance the further sum of $2,000, advanced to Botet $1,003.54 to aid him in making his tobacco crop, and received only $708.16 out of the proceeds of the sale of the crop. The evidence also conclusively shows that Gonzalez & Co. advanced goods under the contract on and after January 2, 1929, of the value of $1,385.98, and $602.48 in cash for fertilizers, or a total of $1,988.46; and that they received and kept out of the proceeds derived from the sale of the tobacco only $1,643.26.

In respect to the further advancements, there is nothing to show that the contract was not made in absolute good faith, and it is not questioned but that advancements in merchandise and money of the value above set out were actually made by Lopez & Co. and Gonzalez & Co.

The evidence, not only shows that these further advancements were actually made under the agricultural loan contract, but that substantially all, if not all, of them, whether in goods or money, were used by Botet in making and storing his crop. But having shown that advancements were actually made under the loan contract, it was not necessary that the defendants should show that Botet used the money or property advanced in the making of his crop, to establish their right to a lien on the crop under the contract. This was so held by the Supreme Court of Porto Rico in Gomez v. Bravo et al., 34 Porto Rico 141.

Some question is raised as to whether, under the Porto Rican Act No. 37 of March 10, 1910, as amended by the Act No. 66 of August 1, 1925, advances for agricultural purposes may be made in merchandise as well as in cash. The Spanish text in the original act, and as amended, reads as follows: "Entiendese por contrato de refaccion agricola aquel mediante el cual una de las partes en-

trega y la otra recibe con caracter devolutivo, determinadas cantidades de dinero efectivo o en especies, bien en una sola vez o en distintas ocasiones."

The English translation given in the Porto Rican laws is as follows: "A contract of advances for agricultural purposes is one under which one of the parties thereto turns over and the other party receives, subject to reimbursement, a certain amount of money in cash or specie, whether in lump sum or in different instalments, etc."

The Spanish words, "dinero efectivo" mean "cash." The words "en especies," according to the Royal Spanish Dictionary of the Spanish Language, Fifteenth Edition, mean "fruitage or merchandise." If such is the correct meaning of the language used, it is evident that the act contemplates that advancements for agricultural purposes may be made in cash or in fruits or merchandise.

The Supreme Court of Porto Rico, in Gomez v. Bravo, supra, at page 146 of 34 Porto Rico, evidently took this view of the act, for it said: "Section 1 of Act No. 37 [1910] provides that a contract of advances for agricultural purposes is one under which one of the parties thereto turns over and the other party receives, subject to reimbursement, a certain amount of money in cash or its equivalent."

And continuing on page 147 of 34 Porto Rico it said: "From the foregoing it may be seen that an agricultural loan contract arises from the delivery of cash or its equivalent for the cultivation of the property."

As, under the statute (Act No. 37, of 1910, amended by Act No. 66, 1925), advancements may be made in cash or merchandise, and the lender is not required to show that the advancements in fact went into the making of the crop, and the defendants, Gonzalez & Co., actually advanced under the contract $1,385.98 in goods and $602.48 in cash, or a total of $1,988.46, to Botet to make, harvest, and store his crop, and received out of the proceeds of the crop for their own benefit only $1,643.26, or a sum more than $340 less than the sum they had actually advanced, no other conclusion can be reached than that the court below erred in ordering the defendants to pay the trustee the sum of $2,351.42, which includes, not only the $1,643.26, which the defendant actually received out of the crop, but the $708.16, which Lopez & Co. received out of it.

The $1,643.26, which the defendants had out of the proceeds of the crop, though re-

ceived within the four months, was not a preference. They had a valid lien on the crop, created prior to the four months' period, for more than that sum. The same would be true if their lien were only an equitable one and not one sanctioned at law. Massachusetts Trust Co. v. MacPherson (C. C. A., 1st Circuit) 1 F.(2d) 769, 771, 772; Harding v. Federal Nat. Bank (C. C. A.) 31 F.(2d) 914; Boyle v. Gray (C. C. A.) 28 F.(2d) 7; Beacon Trust Co. v. Dolan (C. C. A.) 27 F.(2d) 247; Forman v. Jacobs (C. C. A.) 26 F.(2d) 764; Credito y Ahorro Ponceno v. Gorbia (C. C. A.) 25 F.(2d) 817, 820.

Moreover, the other creditors of Botet were not prejudiced by the statement in the contract that $6,000 had already been advanced for making the crop, for the value of the crop was not sufficient even to meet the further advancements actually made for the purpose of making the crop. Some of the further advances undoubtedly were used to rebuild the tobacco barns, which the statute authorized, thereby enhancing the value of the property remaining to general creditors.

The decree of the District Court is vacated, and the case is remanded to that court, with directions to enter a decree for the defendants, with costs.

WILSON, Circuit Judge (dissenting).

I cannot agree to the majority opinion. It is conceded, and the evidence is conclusive on the point, that the merchandise furnished by Gonzalez & Co. and Lopez & Co. prior to January 2, 1929, or at least prior to December 21, 1928, was not furnished the bankrupt as advances to aid him in preparing, cultivating, or harvesting his crop of tobacco in the year 1928-29. Up to this time they had no agricultural lien on his tobacco crop or any right to one, nor could he give them security thereon for such prior indebtedness, even prior to four months of the filing of the petition in bankruptcy, if done to hinder and delay other creditors.

This prior indebtedness was incurred over a period of a year beginning in October, 1927, and for boots, shoes, and notions for sale in his store, the bankrupt being a merchant.

Prior to this, in October, 1927, the bankrupt had mortgaged all his real estate to Gonzalez & Co. to secure creditors whose indebtedness exceeded the value of the property or his equity therein, and had defaulted in July, 1928, in his payments under this mortgage. Failing to obtain credit elsewhere, he

appealed to Gonzalez & Co. and Lopez in December, 1928, to aid him in harvesting his crop of tobacco on three small parcels of land totaling 25 acres, agreeing to give them a refaccion or crop mortgage to secure not only future advances for agricultural purposes, but the past unsecured indebtedness of approximately $4,000. When the refaccion contract was executed in January, 1929, it stated that Gonzalez & Co. and Lopez & Co. had already advanced Botet $6,000 for agricultural purposes, that is, for necessary expenses in cultivating his crop of tobacco, although they well knew that it was not advanced for that purpose, and that their total unsecured indebtedness at that time could not have exceeded $4,900, even if the advances by Lopez & Co. on December 21, 1928, and by Gonzalez & Co. on January 2, 1929, were included, and if these two items are treated as a part of their advances for agricultural purposes under the refaccion contract, as the opinion holds, their prior unsecured indebtedness was less than $4,000 instead of $6,000 as stated in the contract, and none of it had been advanced for agricultural purposes.

The majority opinion holds, as I understand it, that, since it does not appear that the false statements in the contract as to the amount of the prior unsecured indebtedness and that it had been advanced for agricultural purposes actually injured any creditors, presumably because the proceeds of the sale of the tobacco did not fully reimburse Gonzalez & Co. and Lopez & Co. for the amount actually advanced by them after the contract was agreed upon, though it more than reimbursed them for advances made after it was recorded, it did not prevent a valid lien attaching in equity, if not under the refaccion statute of Porto Rico, and any transfer of the property to which the lien attached, or of the proceeds of a sale thereof, was not a preference under the Bankruptcy Act, even though within four months of the filing of a petition in bankruptcy.

But the appellant here claims under the refaccion contract. The District Court, under sections 70 (a) (4) and 70 (b) of the Bankruptcy Act, found that the contract, though entered into more than four months prior to the petition in bankruptcy, was conceived in fraud and intended to hinder and delay creditors. The real issue before this court is whether this finding was clearly wrong, not whether the appellant later actually advanced for agricultural purposes

more than they finally received. Boyle v. Gray (C. C. A.) 28 F.(2d) 7. If the contract was not fraudulent as to other creditors, then the defendant's lien for actual advances was good and no preference resulted; but if the appellants fraudulently entered into the contract to secure for themselves, not only future amounts actually advanced for agricultural purposes, but other indebtedness for which they were not entitled to such a lien, they are not here with clean hands, and under the well-known equity rule can hold nothing under the contract. It is not a case where a part of the consideration of a contract is good and can be separated from the bad and upheld to that extent. The entire contract being conceived in fraud, a court of equity will not uphold any part of it.

I think it cannot be said that the finding of the District Court was clearly wrong. It appeared that the bankrupt with the full knowledge of both creditors, who must have known his financial condition, not only misrepresented the amount of their previous unsecured indebtedness, but also falsely stated that it was advanced for agricultural purposes. To hold that such a contract was conceived in good faith requires more credulity than I possess. The District Judge heard the witnesses and the lame explanation which the representative of the appellant gave for omitting to give credit for the payment of $1,100 on its claim, which omission was obviously done to give color to the representation that they had previous to January 2, 1929, advanced $6,000. The advances made on December 21, 1928, by Lopez & Co. and on January 2, 1929, by Gonzalez & Co. were also juggled back and forth by the parties in testifying to give color to their claim that their prior advances total $6,000, and that their advances under the refaccion contract exceeded the amount they received from the sale of the tobacco. I think there was sufficient evidence to warrant the conclusion of the District Court that the contract was fraudulent and intended by the parties to hinder and delay the other unsecured creditors of the bankrupt, especially if any credence can be given to the testimony of the bankrupt that he had reasonable ground for believing that out of the proceeds of his crop he might repay a large part, if not all, of his past unsecured indebtedness to the appellant and Lopez & Co. That the contract was entered into to insure the payment of this prior indebtedness, or any part, and to that extent to hinder other unsecured creditors from receiving their just share of the proceeds of the crop, does not render it any less fraudulent, because, owing to unforeseen causes, it failed to produce an amount equal to the sums actually advanced after it was executed. It is the intent of the parties at the inception and not the result that determines the presence of fraud.

If, therefore, the contract was fraudulent in its inception, and it was entered into for the purpose of hindering or delaying creditors, it makes no difference whether it was made within four months or not. If invalid, any payment made within four months of the date of bankruptcy by virtue of its terms would become a preference.

If the findings by the District Court are not clearly wrong, this case does not present a situation for applying the rule as to equitable liens laid down in the cases cited in the opinion. In those cases the contract under which the lien was created was held by the trial court and this court to have been entered into in good faith, and the alleged preference resulted merely from an enforcement of the lien and dated back to the granting of the lien, which was more than four months prior to the bankruptcy petition.

The fact that Gonzalez & Co. paid to Lopez & Co. a part of the money they received does not relieve them of liability for the full amount. They accepted a preference from the bankrupt. If they paid out part of it, it does not relieve them of the obligation of accounting for it. The trustee is not obliged to trace it into the hands of third parties.