<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-2273

         IN RE:  COLONIAL MORTGAGE BANKERS CORPORATION,
                                 
                            Debtor.
                           __________

                     CREFISA INCORPORATED,

                      Plaintiff, Appellee,

                               v.

                 WASHINGTON MUTUAL BANK, F.A.,

                     Defendant, Appellant.
                           __________

                  HANS LOPEZ-STUBBE, TRUSTEE,

                           Appellant.
                                 

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                             Before

                   Selya, Boudin and Lipez,
                                
                       Circuit Judges.
                                
                                
                                
    Ivan R. Fernandez-Vallejo with whom Rodriguez & Fernandez,
Jorge Souss and Goldman Antonetti & Cordova, P.S.C. were on brief
for appellants.
    Luis R. Montanez-Aviles with whom Montanez & Alicea Law
Offices was on brief for appellee.

August 2, 1999

 BOUDIN, Circuit Judge.  This appeal is taken from a
decision of the United States District Court for the District of
Puerto Rico reversing a decision of the federal bankruptcy court.  
In substance, the district court sustained a claim by Crefisa,
Inc., requiring the bankruptcy trustee of Colonial Mortgage Bankers
Corporation ("Colonial") to pay over approximately $557,000
comprising security for a note held by Crefisa.  The background
events are somewhat complicated.
 In the 1980s, Colonial was engaged in the business of
servicing mortgages.  One of its clients was the Bowery Savings
Bank ("Bowery") (Washington Mutual Bank has now been substituted
for Bowery but it simplifies matters to refer only to Bowery).  By
agreement, Colonial collected mortgage payments due to Bowery and
deposited them into Colonial accounts--in trust for Bowery--in two
different Puerto Rico banks:  Financiero and Banco Santander.  The
president of Colonial was Milton J. Ra.
 In 1980, Ra began a set of transactions that led to the
present case by requesting a $500,000 loan from Caguas Central
Federal Savings Bank ("Caguas"), a bank with which Colonial, Ra,
or both had had past dealings.  The loan to Ra, which may have
been irregular, involved Ra's execution on November 26, 1986, of
a promissory note due on demand for $500,000 in favor of Caguas.  
On November 28, 1986, the loan was completed through the following
transactions:
   Caguas made a $500,000 deposit representing
 the loan into Ra's personal checking account
 in the bank;
    
   Ra opened a new savings account at the bank
 called a Golden Passbook account with a
 $500,000 check drawn on his checking account;
 
   Ra made a written pledge of the Golden
 Passbook account as collateral to secure his
 $500,000 promissory note and any other current
 or future debts to Caguas.

 The Golden Passbook account--the treasure trove in this
case--was opened as a personal savings account of Ra, but the
passbook bore the legend "Colonial Mortgage Bank, B.S.B., Corp."
(the "B.S.B." apparently standing for Bowery Savings Bank) and the
passbook was later shown to Bowery auditors to persuade them that
the account held funds in Colonial's name belonging to Bowery.  
There is some indication that Ra later sought to transfer
ownership of the Golden Passbook account to Colonial but that
Caguas rejected this effort on the ground that it did not maintain
savings accounts for corporations.
 In December 1987, Colonial filed for bankruptcy giving
rise to the present case.  Puerto Rico financial authorities later
concluded that Colonial and Ra had diverted millions of dollars
from trust accounts that Colonial had managed and had channeled the
money into accounts at the Caguas bank where the funds were
expended for the benefit of Colonial and Ra.  In all events, in
the same month as the Colonial bankruptcy, Bowery brought suit in
the district court seeking to recover from Colonial, Caguas, Ra
and Ra's wife about $1,000,000 in diverted Bowery funds.  Bowery
Savings Bank v. Colonial Mortgage Bankers Corp., 87-874-RLA
(D.P.R.)
 In April 1988, the bankruptcy court entered an order at
the behest of Colonial's bankruptcy trustee, Hans Lopez-Stubbe,
requiring Caguas to turn over the funds in the Golden Passbook
account to the trustee.  The trustee's theory, it appears, was
that the funds, being held in the Golden Passbook account with a
passbook bearing Colonial's name, properly belonged to Colonial's
estate.  In November 1989, Caguas paid over to the trustee
approximately $557,000 pursuant to the bankruptcy court order, the
amount representing the original principal of $500,000 plus
accumulated interest.
 In 1990, Caguas failed, and the Resolution Trust
Corporation ("RTC") was appointed, initially as conservator for
Caguas and later as its receiver.  Thereafter, the RTC on December
21, 1990, endorsed Ra's promissory note in favor of Caguas to
Banco Santander.  The note was later re-endorsed by Banco Santander
to Crefisa, which is apparently a wholly owned subsidiary of Banco
Santander.  The endorsement was part of a multi-million dollar sale
of Caguas' assets by the RTC to Banco Santander pursuant to a
purchase and sale agreement.  But the question whether the terms of
the purchase and sale agreement are properly considered in this
case is one of the contested issues on this appeal.
 On October 6, 1991, Crefisa brought an adversary
proceeding in the Colonial bankruptcy case asserting a security
interest in the Golden Passbook account; the claim was based on the
pledge of the Golden Passbook account that Ra had made to Caguas
on November 28, 1986, to secure his promissory note.  Since the
funds in the Golden Passbook account had been turned over to the
trustee pursuant to the bankruptcy court's earlier order, the
relief sought by Crefisa was an order from the bankruptcy court
requiring the trustee to transfer the proceeds to Crefisa.
 The bankruptcy trustee, supported by Bowery, opposed
Crefisa's request that the funds derived from the Golden Passbook
account be transferred to Crefisa and filed a discovery request to
identify the basis for Crefisa's claim to a security interest in
the account.  In April 1994, Crefisa produced Ra's promissory note
to Caguas, whose markings showed that it had been endorsed
successively by the RTC to Banco Santander and by Banco Santander
to Crefisa.  The trustee then moved to dismiss Crefisa's adversary
proceeding or for summary judgment; he asserted that Crefisa had
not established any interest in the Golden Passbook account since
the promissory note made no reference to any security and Crefisa
had provided no other evidence to support its claim to the
security.
 After additional filings but no further pertinent
evidence from Crefisa, the bankruptcy court on January 25, 1995,
issued a decision in favor of the trustee and dismissed Crefisa's
complaint.  In a nutshell, the bankruptcy court ruled that the
promissory note's transfer was governed by Puerto Rico's Negotiable
Instruments Law, which did not provide for automatic transfer of
the security for an assigned note, rather than by the Civil Code,
P.R. Laws Ann. tit. 31,  1 et seq.; and even if the Civil Code
were applicable to the transfer, its requirements for an automatic
transfer of a security interest had not been met as to third
parties, see P.R. Laws Ann. tit. 31,  3941.  Since the promissory
note made no mention of security, Crefisa had not shown that it had
obtained Caguas' security interest in the account.  The bankruptcy
court entered judgment against Crefisa, and Crefisa appealed to the
district court on March 3, 1995.
 Three days later, on March 6, 1995, Crefisa filed a
motion in the bankruptcy court to amend the judgment, tendering
portions of the purchase and sale agreement dated December 21,
1990, between the RTC and Banco Santander for the sale of the
Caguas assets to Banco Santander.  The bankruptcy judge later
denied the motion on the ground that it lacked jurisdiction because
of the then-pending Crefisa appeal to the district court.  The
trustee also moved in the district court to strike the agreement
from the record on appeal, but in various orders in the spring of
1996, the district court denied the motion to strike and asked
Crefisa to submit a complete copy of the purchase and sale
document.  Crefisa filings in June 1996 and November 1996 purported
to comply with this request and to add further information about
the RTC-Banco Santander transaction.
 In July 1996, the trustee and Bowery moved to "dismiss
the appeal" to the district court, essentially arguing the merits
of the appeal and defending the bankruptcy court's decision. On
August 27, 1996, Crefisa opposed the motion but also argued the
merits, urging that the bankruptcy judge had erred.  On September
14, 1998, the district court released a decision and judgment
reversing the bankruptcy court and determining that Crefisa was
entitled to claim a security interest in the Golden Passbook
account.
 In its decision, the district court found that the
purchase and sale agreement between RTC and Banco Santander
confirmed the intent of the parties to effect a transfer of the
security interest.  Alternatively, the court ruled that Caguas'
security interest in the Golden Passbook account had been
transferred by operation of law under the Civil Code by virtue of
transfer of Ra's promissory note from Caguas, through the RTC and
Banco Santander, to Crefisa; in the court's view the Negotiable
Instruments Law governed the transfer of the note and the Civil
Code provided for an automatic transfer of the security interest.
 The trustee and Bowery now appeal, asking that we
reinstate the bankruptcy court's ruling and confirm the trustee's
right to the Golden Passbook account proceeds.  Their first
argument is that as a procedural matter, the district court had no
business considering the purchase and sale agreement because it had
not been offered in evidence in the bankruptcy court; and their
second argument is that the district court's alternative reliance
on the Civil Code to effect an automatic transfer of the security
misreads the substantive law.  (A third argument merely repeats
fragments of the first two.)
 On the procedural issue, we sympathize with the district
court's desire to know the full story of the transfer but agree
with the trustee that the district court was not entitled to
consider the purchase and sale agreement.  In an appeal from the
bankruptcy court, the district court sits in an appellate capacity,
Fed. R. Bankr. P. 8001; and, just as a circuit court is limited to
the district court record, 16A Wright, Miller & Cooper, Federal
Practice and Procedure  3956.2, at 337 (3d ed. 1999), so the
district court is normally limited to the evidentiary record
compiled in the bankruptcy court, Crawford v. Lamantia, 34 F.3d 28,
31 (1st Cir.), cert. denied, 514 U.S. 1032 (1995); In re Armorflite
Precision, Inc., 48 B.R. 994, 997 (D. Me. 1985).
 In rejecting the trustee's motion to strike, the district
court said in substance that the purchase and sale agreement was
material to the dispute.  This is at least arguably so.  But when
a party that has favorable evidence fails to proffer it before the
trial court decides a matter, the fact that the evidence would have
been material if offered does not mean that it can be considered on
the appeal.  The reason is obvious: the procedures used on
appellate review are not designed to vet new evidence or allow an
effective evidentiary response to it.
 When the bankruptcy judge decided the trustee's motion to
dismiss or for summary judgment, the purchase and sale agreement
was not considered because Crefisa failed to submit it in
opposition to the trustee's motion.  On review, the question for
the district court was whether the bankruptcy judge reached the
right decision on the record made by the parties.  Crefisa is
mistaken in arguing that the district court was entitled to
consider the purchase and sale agreement as evidence of the
transfer of the security interest simply because the agreement was
physically annexed to Crefisa's later motion to amend the judgment.  
See Kirshner v. Uniden Corp., 842 F.2d 1074, 1077 (9th Cir. 1988).
 Of course, Crefisa could have sought review in the
district court of the bankruptcy judge's post-decision refusal to
enlarge the record.  For that purpose, the agreement would be
available to the district court, like an offer of proof, for the
purpose of determining whether that refusal was error (but only for
that purpose).  However, Crefisa makes no claim in this court that
the bankruptcy judge erred in denying the post-decision motion to
amend the judgment and there is no indication that that denial was
even appealed to the district court.
 Limiting the evidence to that properly before the trier
of fact is not some ritual or formality.  If Crefisa had offered
the agreement in the bankruptcy court in timely fashion, the
trustee would have been entitled to dispute the validity or
significance of the agreement or offer counter-evidence of his own.  
The trustee lists for us some of his objections to the agreement,
saying inter alia that the document was incomplete, lacked a
signature page, is only an agreement for a future transaction, and-
-being between RTC and Banco Santander--does not transfer anything
to Crefisa.  But a party objecting to evidence newly tendered on
appeal is not obliged to show unfair prejudice:  the point is that
new evidence, which could have been offered in the trial court, is
not supposed to be proffered for the first time in an appellate
setting.
 There are qualifications to every general rule.  See 16A
Wright, Miller & Cooper, supra,  3956.4, at 349-50.  Occasions
exist on which appellate panels do need to consider facts not
before the trial court (e.g., on claims of mootness), and
procedures exist for reopening judgments to consider newly
discovered evidence.  Fed. R. Civ. P. 60(b)(2).  But Crefisa has
pointed us to no exception or extraordinary circumstance that might
embrace the purchase and sale document submitted in this case--a
document that ought to have been known to Crefisa from the outset
and whose completeness and significance are open to substantial
questions.
 This brings us to the trustee's attack on the district
court's alternative ground for its decision, namely, the court's
ruling that even apart from the agreement, the admitted endorsement
of the note by the RTC to Banco Santander and then by it to Crefisa
carried the security interest with it by operation of law.  It is
common ground that the Negotiable Instruments Law, which provides
for the transfer of the note merely by endorsement, says nothing
about the transfer of security interests.  The bankruptcy judge
took the view that Crefisa could not "pick and choose," using the
Negotiable Instruments Law to effect the assignment of the note and
the Civil Code to transfer the security.
 But we read the Negotiable Instruments Law as inviting
supplementation wherever it is itself silent:  "In any case not
provided for in this title [the Negotiable Instruments Law] the
rules of the Law Merchant, Civil Law and Equity shall govern."  
P.R. Laws Ann. tit. 19,  386; see also P.R. Laws Ann. tit. 31,  
12.  Only if there is a conflict with respect to a negotiable
instrument does "this title" automatically prevail.  E.g., Pars v.
Canety, 73 P.R.R. 386, 388 (1952).  And nothing in the Negotiable
Instruments Law forbids a transfer of a security interest incident
to the endorsement of a note.
 The next question, then, is whether Puerto Rico law does
provide that the assignment of a debt transfers a security interest
in property pledged to secure the debt.  Crefisa relies directly on
the Civil Code provision, codified at P.R. Laws Ann. tit. 31,  
3943, which says that "[t]he sale or assignment of a credit [i.e.,
the right to collect a debt] includes that of all the accessory
rights, such as the security, mortgage, pledge, or privilege."  The
district judge took section 3943 as providing an alternative ground
for upholding Crefisa's right to the security interest at issue in
this case.
 It appears to be true that section 3943, in providing for
automatic transfer of security interests, has been treated without
much discussion as applying to negotiable notes.  Credito Y Ahorro
Ponceno v. Gorbia, 25 F.2d 817 (1st Cir. 1928); Caguas Co., Inc. v.
Lopez, 59 P.R.R. 263, 271 (1941).  However, the same subdivision of
the Civil Code containing section 3943 also contains a companion
provision, which reads:  "The assignment of a credit, right, or
action shall produce no effect against a third person but from the
time the date is considered fixed, in accordance with sections 3273
and 3282 of this title."    P.R. Laws Ann. tit. 31,  3941.  
 Sections 3273 and 3282 are primarily evidence provisions
somewhat awkwardly adopted by section 3941 for substantive
purposes.  One deals with proof of public instruments and the other
with proof of private instruments.  Public instruments are
primarily those that have been notarized, P.R. Laws Ann. tit. 31,
3271, and there is no indication in this record that the note was
transferred by a notarized document.  Accordingly, the endorsed
note in this case appears to qualify (at best) as a private
instrument, as to which section 3282 provides in pertinent part:   
   The date of a private instrument shall be
 considered, with regard to third persons, only
 from the date on which it may have been filed
 or entered in a public registry, from the
 death of any of those who signed it, or from
 the date on which it may have been delivered
 to a public official by virtue of his office.

 Thus, coupling sections 3941 and 3282 together, the
language of the two provisions indicates that the transfer of "the
credit" embodied in the promissory note could have "no effect"
under the Civil Code against a third party until some document
evidencing the assignment of the debt was filed in a public
registry or delivered to a public official.  So far as the record
shows, this has never occurred.  And if the assignment of the debt
is not effective against a third party so far as the Civil Code is
concerned, it is hard to see how an automatic transfer of a
security interest incident to the transfer of the debt can be
effective under the Civil Code against a third party.
 The district court recognized the objection based on
sections 3273, 3282, and 3941 but said that these sections dealt
with the effect of the assignments of credits "against a third
party," and had no "applicability" in this case.  But the trustee
is formally a third party vis  vis the assignment of the note
and/or security interest, and section 3941 is manifestly a
limitation on section 3943.  While the transfer of the note
remains valid under the Negotiable Instruments Law regardless of
section 3282, it is hard to see how the transfer of a security
interest under section 3943 can be given effect based on an
assignment of a debt that is not allowed under section 3941 to
affect a third person unless and until the assignment is
registered.  If there is an answer to this objection, neither the
district court nor Crefisa has supplied it.
 There is a possible answer.  It is fairly easy to guess
why section 3941 was framed:  without notice of a transfer, a third
party could easily be prejudiced by the private transfer of a debt
or by the automatic transfer of an ancillary security interest
designed to secure a debt.  Seemingly, section 3941 is designed to
secure such notice, at least constructively, by a requirement of
public filing of the assignment.  Of course, a negotiable
instrument is designed to be transferred without notice to third
parties; but the transfer of a security interest, not mentioned in
the note, presents the same danger as the transfer of any property
other than a negotiable instrument.
 One might reasonably argue that even if the language of
section 3941 supports the trustee, its rationale does not apply to
him in this instance.  After all, the trustee did not take any
action (except for litigation expenses) in reliance on Caguas'
"ownership" of the security interest.  This is far from a case in
which the trustee purchased an object from a prior owner only to be
faced with a claim that the owner had previously made a secret
assignment or sale to another.  Thus, one could argue that the
trustee should not be able to invoke section 3941 even though
literally read it appears to shield him from the effect of section
3943.
 This policy argument has not been made by Crefisa and it
may or may not be valid.  Sometimes statutes are read in accordance
with their rationale even in the teeth of statutory language, but
other times they do enact rules not perfectly fitted to their
rationale.  See Level 3 Communications, Inc. v. Federal Ins. Co.,
168 F.3d 956, 958 (7th Cir. 1999) (Posner, C.J.).  Puerto Rico
precedent in this case is at best obscure.  Cf. Hernandez v.
Iglesias, 58 P.R.R. 406 (1941).  And needless to say, we have not
had the benefit of any research by the parties on this issue.  
Crefisa has forfeited the policy argument by failing to make it.  
Executive Leasing Corp v. Banco Popular, 48 F.3d 66, 67-68 & n.3
(1st Cir. 1995).
 About the best we can say in this instance is that we find
the policy argument plausible but not compelling.  In these
circumstances, we are not going to rescue the district court's
judgment on a ground that was not argued to us and may or may not
be correct.  We have mentioned this possible escape hatch only to
be sure that our opinion is not taken to foreclose such an argument
if made by the parties in a similar case in the future.  Since the
problem arises primarily from language in the Civil Code, the
replacement of the Negotiable Instrument Law is no assurance against
a recurrence of this issue.
 For the reasons stated, we conclude that on the record
before it the bankruptcy court correctly dismissed Crefisa's
adversary petition and that the district court erred in reversing
the bankruptcy court.  Accordingly, the judgment of the district
court is reversed.

</body>

</html>